The **SHERWIN–WILLIAMS COMPANY, Plaintiff,**

v.

**CERTAIN UNDERWRITERS AT LLOYD'S LONDON, and the London Market Insurance Companies, Defendants.**

**No. 1:91 CV 0597.**

United States District Court,
N.D. Ohio, E.D.

Feb. 17, 1993.

As Modified Feb. 25, 1993.

Dale Alan Normington, John W. Lebold, Sherwin–Williams Co., Cleveland, OH, for plaintiff.

William F. Scully, Keller Scully & Williams, Cleveland, OH, Robert J. Brown, James A. McGuire, William G. Goldsmith, Mendes & Mount, New York City, for defendants.

## ORDER

BATTISTI, District Judge.

This is an action for a declaratory judgment brought by the Sherwin–Williams Company ("Sherwin–Williams") against Certain Underwriters at Lloyd's London and the London Market Insurance Companies (collectively, the "London Market Insurers"). Jurisdiction over the action is based on diversity of citizenship. 28 U.S.C. § 1332.

The Complaint states a number of claims for relief stemming from policies of insurance sold by the London Market Insurers to Sherwin–Williams for the period from at least 1943 to 1980. These policies allegedly obligate the London Market Insurers to defend and indemnify Sherwin–Williams in five suits for damages from the use of lead pigment in paint.

Before the Court are Sherwin–Williams' Motion for Partial Summary Judgment on the duty to defend and pay defense costs and the London Market Insurers' Cross–Motion for Summary Judgment. The fundamental question presented by these motions is whether the London Market Insurers' coverage encompasses any of the claims found in the lead pigment complaints. Resolution of this question requires an understanding of the long relationship between the two parties, their handling of the lead pigment cases, the policy language in effect between them, and, most importantly, the complaints in each of the five cases. Based on the following analysis of these factors, Sherwin–

Williams' Motion is granted and the London Market Insurers' Motion is denied.

## FACTUAL BACKGROUND

A. The Relationship Between Sherwin–Williams and the London Market Insurers

The London Market Insurers are various underwriters that are either incorporated in or have their principal place of business in the United Kingdom. For over five decades, they provided primary liability insurance to Sherwin–Williams, an Ohio corporation that produces paints, wall coverings, and related products for sale in the United States and internationally. Although the parties disagree over when such coverage began,[1] it is clear that the London Market Insurers' terminated their relationship in 1980.

The policies issued by the London Market Insurers provided coverage to Sherwin–Williams for personal injury, property damage, and products property damage claims. Equally as important, each policy contained various provisions obligating the London Market Insurers to assume the defense of claims and suits against Sherwin–Williams potentially within the scope of the insurance coverage. For instance, the 1948 policy obligated the London Market Insurers to "defend, in the name and on the behalf of the Insured, all claims or suits for damages for such injuries, for which damages the Insured is, or is alleged to be liable." (Ex. 1 to Goldsmith Aff.) This language was changed in the 1960s to read:

With respect to such insurance as is afforded by this policy, the Underwriters shall:

(a) defend any suit against the Assured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Underwriters may make such investiga-

---

1. Sherwin–Williams alleges that coverage began in 1929, but the London Market Insurers allege that they have no records of policies issued before 1943. The oldest policy submitted by Sherwin–Williams appears to be the policy covering November 1936 to November 1937. (*See* Ex. N to Berkshire Aff. II.)

tion, negotiation and settlement of any claim or suit as they deem expedient. (Ex. 3 to Goldsmith Aff.)

Beginning in 1960, Sherwin–Williams executed a series of "hold harmless agreements" in which it agreed to indemnify the London Market Insurers for amounts otherwise covered under the policies, including defense costs. The amount covered in 1960 by the particular hold harmless agreement in effect between the parties was $10,000 for each occurrence subject to a $25,000 annual aggregate limit. By 1979, this had increased to $200,000 for each occurrence subject to a $500,000 annual aggregate limit.

Despite the express language of the policies, it became the practice of the parties as a result of the hold harmless agreements for Sherwin–Williams to control the defense of all claims filed against it and then to seek reimbursement from the London Market Insurers. Sherwin–Williams continued to forward to the London Market Insurers material on all pending litigation, including pleadings, discovery requests and responses, motion papers, and deposition transcripts. Apparently, neither party objected to or deviated from this practice until the filing of the cases involving lead pigment.

B. The Lead Pigment Cases

The five suits at the heart of this case involve claims filed against Sherwin–Williams and various other defendants for property damage and personal injury from exposure to lead pigment in paint. Sherwin–Williams' liability allegedly stems from its role as a supplier of lead pigment and producer of lead-based paint up until the 1950s.

In the first suit, *Santiago v. Sherwin–Williams*, No. 87–2799–T (D.Mass., filed November, 1987), the plaintiff allegedly sustained bodily injury from her ingestion of lead paint which had chipped or peeled from the walls of her residence during the years 1972 to 1978. The complaint in *Santiago* asserts claims based on negligence and breach of warranty against Sherwin–Williams and the other defendants.

In the second suit, *City of New York v. Lead Industries Association, Inc.*, No. 14365–89 (N.Y.Sup.Ct., filed June 7, 1989), the plaintiffs are the City of New York and two other city agencies. The plaintiffs seek damages covering the cost of paying judgments obtained in lead pigment cases filed against the City; the costs of inspecting, testing, monitoring, and abating lead paint hazards; the costs of screening, testing and diagnosing children exposed to lead paint; and the costs associated with educating city residents. The plaintiffs base Sherwin–Williams' liability on its alleged fraud and misrepresentation, negligence, strict liability, equitable duty of restitution, and equitable duty of indemnification.

The third suit, *Spells v. Housing Authority of New Orleans*, No. 89–25170 (Civ. Dist.Ct., filed Nov. 29, 1989), is a class action filed on behalf of residents of buildings owned or operated by the Housing Authority of New Orleans ("HANO"). The class seeks an order compelling HANO to remove or cover the lead-based paint in its buildings. HANO filed a third-party complaint against Sherwin–Williams and twelve other defendants alleging that the defendants are liable for reimbursement or indemnification of expenses incurred by HANO in the *Spells* suit. The liability of the third-party defendants is based on their alleged fraud and misrepresentation, negligence, and strict liability.

In the fourth case, *Housing Authority of New Orleans v. Standard Paint and Varnish Company*, No. 90–6901 (Civ.Dist. Ct., filed April 9, 1990), HANO filed suit against Sherwin–Williams and other defendants for reimbursement of expenses incurred in complying with a consent judgment in the case of *Virginia Mitchell v. Housing Authority of New Orleans*, No. 87–1446 (E.D.La.). The *Virginia Mitchell* case was a class action to compel HANO to comply with federal regulations concerning lead abatement. The liability of the defendants in the *HANO* case is premised on essentially the same theories and allegations put forward by HANO in its third-party complaint in *Spells*.

Finally, in the fifth suit filed against Sherwin–Williams, *City of Philadelphia v. Lead Industries Association*, No. 90–7064 (E.D.Pa., filed Nov. 9, 1990, amended complaint filed Sept. 30, 1990), the City of Philadelphia brought a purported class action on behalf of itself and all cities in the United States with a population over 100,-000 persons. The City's complaint alleges claims for relief based on negligence, strict liability, breach of warranties, fraud and misrepresentation, restitution, and indemnification. This suit states many of the same allegations and claims for relief as the *City of New York* action.

## C. The Insurance Coverage Dispute

After the filing of each of the lead pigment cases, Sherwin–Williams sought coverage from the London Market Insurers under the previously described policies of insurance. Sherwin–Williams provided notice of coverage by either forwarding a copy of the complaint or by referring to a case in correspondence with the London Market Insurers' attorneys. The London Market Insurers responded to each claim by reserving their rights under the policies and by requesting more information.

Rather than forward the case files and other documents as it had done in the past, Sherwin–Williams chose instead to provide periodic written or oral progress reports. Written reports usually were provided by letter with a single paragraph, or sometimes a single sentence, devoted to each case. Oral reports were delivered over the phone, at Sherwin–Williams' offices in Cleveland, or during meetings of the parties in New York.

There is some dispute between the parties over the reason for the development and continuation of this procedure. Sherwin–Williams claims that the procedure developed in part at the suggestion of the London Market Insurers as a matter of convenience to both sides and that it was retained because Sherwin–Williams needed to protect confidential information after the London Market Insurers contested coverage. The London Market Insurers, on the other hand, allege that the procedure developed and continued almost entirely because Sherwin–Williams refused to make information about the cases available in any other manner.

In letters to the London Market Insurers or their attorneys, Sherwin–Williams made another break with the past by requesting immediate reimbursement for legal expenses incurred in defending the lead pigment cases and by neglecting to include itemized bills and receipts. As recounted above, the past practice had been for Sherwin–Williams to seek reimbursement only at the close of a case and to include an accounting of the expenses involved.

Despite several attempts, the parties were unable to settle their disputes. For the *Santiago* case, however, the London Market Insurers agreed in June of 1991 to reimburse Sherwin–Williams for some of the defense costs. Sherwin–Williams delivered itemized bills to the London Market Insurers in June and August 1991, and the London Market Insurers made payments totalling $2,867,740.62 in 1991 and early 1992.

The inability of the parties to resolve the disputes in the remaining four cases and the London Market Insurers' delay in fully reimbursing defense costs in *Santiago* led Sherwin–Williams to file this action for a declaratory judgment in April 1991. Sherwin–Williams alleges that the London Market Insurers have a duty to defend and indemnify in each of the lead pigment cases and that the London Market Insurers breached their contracts of insurance and their common-law and contractual duties of good faith and fair dealing.

After the London Market Insurers answered the Complaint, Sherwin–Williams moved for partial summary judgment on the duty to defend and pay defense costs. Sherwin–Williams seeks orders against the London Market Insurers to pay: (1) all future costs and attorneys' fees in connection with the lead pigment cases; (2) all past costs and expenses, including attorneys' fees; (3) the costs and attorneys' fees associated with bringing the declaratory judgment action; and (4) prejudgment interest.

The London Market Insurers submitted a memorandum in opposition to Sherwin–Williams' Motion and also moved for summary judgment. They ask the court to declare that they have no obligation to defend Sherwin–Williams or reimburse the company for defense costs in the lead pigment cases. They also seek reimbursement for the amounts already given to Sherwin–Williams for defense expenses in the *Santiago* case.

## THE SUMMARY JUDGMENT STANDARD

■ The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (discussing summary judgment rule). In considering a motion for summary judgment the Court must view all facts and inferences in the light most favorable to the nonmoving party. *Sims v. Memphis Processors, Inc.,* 926 F.2d 524, 526–27 (6th Cir.1991).

"The moving party has the burden of showing the absence of any genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action." *Harris v. Adams,* 873 F.2d 929, 931 (6th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "If this burden is met, the nonmoving party must present 'significant probative evidence' showing that genuine, material factual disputes remain to defeat summary judgment." *Sims,* 926 F.2d at 526 (citations omitted).

## DISCUSSION

A. The London Market Insurers' Duty to Defend

■ Sherwin–Williams has demonstrated that no material factual disputes remain and that they are entitled to summary judgment as a matter of law on the London Market Insurers' duty to defend. In Ohio, two different rules govern an insurer's duty to defend an insured. When an insurer has not agreed to defend groundless claims against the insured, the insurer is entitled to show in a declaratory judgment action that the true facts differ from the facts stated in the complaint against the insured, and the true facts remove the complaint from the scope of the insurer's coverage. *Preferred Risk Ins. Co. v. Gill,* 30 Ohio St.3d 108, 507 N.E.2d 1118 (1987). However, when an insurer has promised to defend an insured based on the allegations in the complaint, as the London Market Insurers have done here, the insurer must defend when the facts in the complaint arguably or potentially fall within the scope of the insurer's coverage or when there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded. *City of Willoughby Hills v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 459 N.E.2d 555 (1984); *Motorists Mutual Ins. Co. v. Trainor,* 33 Ohio St.2d 41, 294 N.E.2d 874 (1973); *Socony–Vacuum Oil Co. v. Continental Cas. Co.,* 144 Ohio St. 382, 59 N.E.2d 199 (1945). This second test is the commonly referred to as the "pleadings" or "scope of the allegations" test. *Monsler v. Cincinnati Cas. Co.,* 74 Ohio App.3d 321, 326, 598 N.E.2d 1203, 1206 (1991).

■ The duty of an insurer to defend under the scope of the allegations test is different from, and broader than, an insurer's duty to reimburse the insured for the underlying claim. Because the insurer is required to defend when a complaint states any claims within the scope of coverage, *Preferred Mutual Ins. Co. v. Thompson,* 23 Ohio St.3d 78, 80, 491 N.E.2d 688, 690 (1986); *Grand River Lime Co. v. Ohio Cas. Ins. Co.,* 32 Ohio App.2d 178, 183, 289 N.E.2d 360, 364 (1972), a duty to defend may exist even though the insurer ultimately may have no obligation to reimburse the insured, *Motorists Mutual* 33 Ohio St.2d at 41, 294 N.E.2d at 875. Likewise, there may be cases when, because of the nature of modern pleading, a complaint does not state a claim within the scope of

coverage and no duty to defend exists, but relief ultimately is granted against the insured on grounds within the scope of coverage and the insurer has a duty to reimburse. *See Lee v. Aetna Cas. & Sur. Co.,* 178 F.2d 750, 752–3 (2nd Cir.1949) (L. Hand, J.) (applying New York law).

 Although the London Market Insurers cite cases from New Jersey suggesting that a separate factual inquiry is required when a complaint fails to resolve questions pertinent to an insurer's duty to defend, *see Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Co.,* 98 N.J. 18, 483 A.2d 402 (1984), *Burd v. Sussex Mutual Ins. Co.,* 56 N.J. 383, 267 A.2d 7 (1970); *CPS Chemical Co. v. Continental Ins. Co.,* 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985), these cases are not binding precedent in Ohio and are not applicable to this case. As stated above, the duty to defend in Ohio arises at the time a complaint is filed. An insurer's duty is based solely on the claims arguably or potentially stated against the insured in the complaint. Doubts in the pleadings regarding coverage, if any exist, must be resolved in favor of the insured rather than in a separate factual inquiry. *Zanco, Inc. v. Michigan Mut. Ins. Co.,* 11 Ohio St.3d 114, 115, 464 N.E.2d 513, 514 (1984) (noting that in Ohio a duty to defend arises "if the pleading against the insured contains allegations which are vague, nebulous, or incomplete such that a potential for coverage exists.").

The London Market Insurers also incorrectly assert that the existence of a duty to reimburse defense costs, instead of a duty to defend, somehow alters the legal standards discussed above. It is true that both parties claim, because of the custom and practice between them, that the duty to defend stated in the contracts of insurance has been "transformed" into a duty to reimburse. The duty on the London Market Insurers, however, appears to be the same regardless of whether a duty to defend or a duty to reimburse exists. In fact, several cases decided by Ohio courts applying the scope of the allegations test actually involved, if read closely, a duty to reimburse.

*See, e.g., City of Willoughby Hills v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 459 N.E.2d 555 (1984); *Zanco, Inc. v. Michigan Mutual Ins. Co.,* 11 Ohio St.3d 114, 464 N.E.2d 513 (1984); *Westfield Ins. Co. v. Healthohio, Inc.,* 73 Ohio App.3d 341, 597 N.E.2d 179 (1992).

 The scope of the allegations test does not place an absolute duty on an insurer to defend its insured. If none of the claims in a complaint against the insured are arguably or potentially within the scope of the insurer's policy, then the insurer obviously has no duty to defend. *Wedge Products, Inc. v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74 (1987). A claim may fall outside the scope of a policy either because the policy does not provide coverage for a particular type of loss, because the policy was not in effect at the time of the accident or occurrence forming the basis for the claim, or because the claim falls within one of the exclusionary clauses found in the policy. Even if the one of the claims is within the scope of the policy, an insurer may have no duty to defend if the insured breached the insurance contract or if the insured misrepresented material facts to the insurer in making its application for coverage.

 Thus, an analysis of the London Market Insurer's duty to defend Sherwin–Williams must be conducted in two steps. First, the language of the insurance policies, including the exclusionary language, must be compared with the claims stated in each of the complaints to determine if any of the claims in the complaints arguably or potentially fall within the scope of London Market Insurers' coverage. In arriving at this determination, ambiguities in the insurance policies must be construed in the Sherwin–Williams' favor and exclusionary language must be read strictly. *American Financial Corp. v. Fireman's Fund Ins. Co.,* 15 Ohio St.2d 171, 173, 239 N.E.2d 33, 35 (1968). Second, if the London Market Insurers have an initial duty to defend on the basis of claims made in the complaints, the London Market Insurers still may be relieved of their contractual obligations if Sherwin–Williams breached the insurance

contracts or made material misrepresentations.

1. *Coverage of the Lead Pigment Cases by the Insurance Policies*

a. The Policy Language

Although the policy language between the parties changed in several respects in the mid–1960s, essentially the same conditions must be satisfied for a claim to fall within the scope of coverage before and after the changes.[2] Under the early policies, a complaint must allege: 1) "bodily injury" or "damage to or destruction of property" 2) caused by an "accident" 3) within the policy period. Likewise, under the later policies, a complaint must allege: 1) "personal injury" or "property damage" 2) resulting from an "occurrence" 3) within the policy period.

For purposes of this decision, two salient differences exist between the early and the later policies. The first difference is that only one of the two clauses covering property damage in the early policies contains a reference to the term "accident." The other clause focuses simply on claims made by reason of the "existence, possession, consumption or use of any product." The second difference is that the later policies contain potentially applicable exclusions, not found in the early policies, covering certain sorts of personal injury and property damage claims.

b. The *Santiago* Complaint

■ A comparison of the above policy language with the *Santiago* complaint reveals that several of Santiago's claims arguably or potentially fall within the scope of the London Market Insurers' coverage. The policies require that a complaint contain allegations of personal injury or property damage. The *Santiago* complaint contains allegations that the plaintiff suffered severe pain, anxiety, mental distress, and fear. The policies also require that the injuries occur during the period of the London Market Insurers' coverage. Santiago alleges that her injuries resulted from her ingestion of lead paint between the years 1972 and 1978, years when the London Market Insurers provided primary liability insurance to Sherwin–Williams. Finally, the policies require that the injuries result from an "occurrence" and that the claim or claims used as the basis for coverage fall outside the scope of the policies' exclusions.[3] The *Santiago* complaint clearly satisfies these last two requirements, but it is worth discussing each more thoroughly.

■ The London Market Insurers argue that none of Santiago's claims constitute "occurrences" because her complaint contains allegations that Sherwin–Williams acted with a degree of foresight and intent. In order for a claim to constitute an occurrence, it must be both "unexpected" and "unintentional." (*See* definition of "occurrence" in Appendix.) Santiago alleges in her complaint that the defendants "knew or should of known" of the dangers of lead paint, and yet continued to furnish lead paint to be used on surfaces to which young children would foreseeably be exposed. She also alleges that the defendants:

conspired and/or acted in concert with each other to conceal from, and mislead retailers, users, applicators, and parents of young children, including plaintiff, with respect to the unreasonable risks and hazards posed to young children by

2. The exact policy language between the parties is set out more fully in the Appendix attached to this Order. It should be noted that this language was compiled, with some difficulty, from the briefing and submissions of both parties. The Plaintiffs provided as exhibits only a "representative sample" of the duty to defend clause in existence between the parties and a box containing forty-years of policies—including primary policies, excess policies, initial policies, and renewal policies. The Defendants provided two policies as exhibits, but never claimed that the language in these policies was a fair representation of the language in effect throughout the insurance relationship. From an examination of all of the evidence submitted, it appears that substantially the same policy language was used from the 1940s to 1964. This language was then changed, and the new language was used until the end of the parties' relationship.

3. Because her injuries occurred between the years 1972 and .1978, the early policy language need not be discussed in connection with Santiago's complaint.

the lead produced and marketed by them and by the paint containing such lead. (*Santiago* Compl. ¶ 26.)

The London Market Insurers ignore the important distinction between intending an act and intending an injury. *See Physician's Insurance Co. v. Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906 (1991); *Kipin Industries, Inc. v. American Universal Ins. Co.*, 41 Ohio App.3d 228, 535 N.E.2d 334 (1987). It is possible to act in a manner producing risk and yet not intend to cause injuries. In *Swanson*, for example, a teenage boy, attempting only to frighten several other children, fired a BB gun striking one child in the leg and another in the right eye. When the parents of the children sued the boy's family, the family's insurers brought a declaratory judgment action to determine their duty to defend and indemnify under a policy containing exclusions for intentional or expected injuries. The court held that the insurers owed a duty because "in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional." *Swanson*, 58 Ohio St.3d at 193, 569 N.E.2d at 911.

In light of the distinction drawn in *Swanson*, it is apparent that the claims in the *Santiago* complaint arguably constitute "occurrences" despite the various allegations of foresight and intent. Although Sherwin–Williams allegedly acted with a knowledge of the risks posed by lead-based paint, Santiago does not allege that the company acted with the intent of injuring consumers or their children. If knowledge of certain risks posed by a product were sufficient to infer intent by a manufacturer to injure consumers, then no manufacturer would ever be able to seek coverage from an insurer because every product has certain known dangers and risks.

With regard to the exclusions found in the policies, it must be noted that none completely relieve the London Market Insurers of their duty to defend Santiago's claims. The only exclusion applicable to personal injuries covers claims "resulting from failure of the Assured's products ... to perform the function or purpose intended by the Assured ... if such failure is due to a mistake or deficiency in design." (*See* Appendix.) Santiago's breach of warranty claim, which mirrors the quoted language, does fall within the exclusion's scope.[4] Her negligence claims do not, however, because their focus is on the conduct of Sherwin–Williams in designing and selling the product, not on the product itself. Since the negligence claims are not covered by any exclusions and a duty to defend a complaint arises if any of its claims are within the scope of coverage, *Preferred Mutual Ins. Co. v. Thompson*, 23 Ohio St.3d 78, 80, 491 N.E.2d 688, 690 (1986), the London Market Insurers have a duty to defend in *Santiago*.

c. The *City of New York* and *City of Philadelphia* Complaints

Just as in *Santiago*, the *City of New York* and *City of Philadelphia* complaints contain claims that are arguably or potentially within the scope of the London Market Insurers' coverage. Both personal injury and property damage are alleged in the complaints, but it is only necessary to reach the personal injury allegations because these are sufficient to create a duty to defend. Specifically, the *City of New York* and *City of Philadelphia* plaintiffs allege that Sherwin–Williams must pay claims brought by building residents for personal injuries from lead paint contamination.[5]

---

**4.** Santiago alleges that the defendants "breached [their] express and implied warranties because said lead and the paint containing it were unsafe, not merchantable quality, and unfit for their intended use and purpose." (*Santiago* Compl. ¶ 23.)

**5.** The plaintiffs in *City of New York* demand damages for at least 78 lawsuits asserted against them for "injury and damage due to the ingestion, inhalation, or absorption of lead paint," (*City of New York* Compl. ¶ 41). Similarly, the plaintiffs in *City of Philadelphia* allege that they are entitled to reimbursement for "liability imposed ... in actions for personal injuries and/or property damage arising out of [the] hazards of lead paint," (*City of Philadelphia* Am. Compl. ¶ 83h).

Even though asserted against the *City of New York* and *City of Philadelphia* plaintiffs, the residents' claims are still within the scope of the London Market Insurers' coverage. The policy language governing the London Market Insurers' duty to indemnify Sherwin–Williams is broad enough to encompass situations in which Sherwin–Williams, because of an obligation under the law, ultimately must reimburse plaintiffs for amounts paid to third parties. For instance, the London Market Insurers promise in their early policies to indemnify Sherwin–Williams "for all sums for which the Assured is found liable for damages," and in the later policies for "all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law." (*See* Appendix.) This language does not limit the scope of the policies to only those claims directly asserted against Sherwin–Williams. *See NL Industries, Inc. v. Commercial Union Insurance Co.*, Civ. No. 90–2124, 1991 WL 398678 (D.N.J. filed July 11, 1991) ("personal injuries" includes claims asserted against lead paint defendants for indemnification); *Transamerica Ins. Co. v. S.A.I. Marketing Corporation*, No. 49256 (Ohio Ct.App.1985) (slip op.), 1985 WL 6860 (available on Lexis) ("property damage" existed within meaning of insurance policy where manufacturer sought indemnification from insured for claims made by manufacturer's customers).

Furthermore, the "personal injuries" creating the basis for coverage arguably or potentially occurred during the term of the London Market Insurers' policies. Although the dates of occurrence are unclear from the information provided in the complaints, so little information is provided that it cannot be proved that the injuries occurred outside of the policy period. Because doubts in the pleadings must be resolved in favor of the insured, the London Market Insurers must provide a defense. *Zanco, Inc. v. Michigan Mut. Ins. Co.*, 11 Ohio St.3d 114, 115, 464 N.E.2d 513, 514 (1984).

Finally, claims are stated in the *City of New York* and *City of Philadelphia* complaints that are "accidents" or "occurrences" and that are outside the scope of the policies' exclusionary language. The plaintiffs in the *City of New York* and *City of Philadelphia* cases allege the same sort of acts of negligent design and negligent failure to warn alleged in *Santiago*. As in that case, these sort of negligent acts are "unintended" and "unexpected" within the meaning of the policies. Also as in that case, none of the exclusions in the policies governing "personal injuries" are applicable.[6] Thus, the London Market Insurers have an initial duty to defend in *City of New York* and *City of Philadelphia*.

### d. The *Spells* and *HANO* Complaints

 The *Spells* and *HANO* complaints also contain claims within the scope of the London Market Insurers' coverage. Unlike the other three complaints already discussed, the *Spells* and *HANO* complaints do not contain allegations of personal injuries. Instead, the complaints allege that Sherwin–Williams must pay the costs of abating the lead paint hazards in HANO's buildings. (*See, e.g., Spells* ¶ 25; *HANO* ¶¶ 3–4.)

The London Market Insurers argue that these types of damages are not "property damage" because HANO seeks recovery for the costs of removing the lead paint, not for the harm to the physical structure of the buildings. To support their argument, the London Market Insurers rely exclusively on the unpublished decision in *National Mutual Ins. Co. v. Concrete Sealants*, 1988 WL 101975 (Ohio Ct.App.1988) (available on Westlaw). In *Concrete Sealants*, an insured who sold a defective sealant paid damages to two of its customers for expenses incurred in the removal and replacement of the sealant and then sought reimbursement from its insurer. The court examined the policies involved and interpreted them as covering damages to other property, not damages from work performed because of the failure of the in-

---

6. Even if the sole exclusion pertaining to personal injuries applied to these claims, the London Market Insurers still would have to defend the complaints because all of the policies are potentially implicated and the early policies do not contain the exclusion.

sured's product. Thus, the court decided that a claim alleging only repair costs did not fall within the scope of the insurer's coverage because it did not allege "property damage" within the meaning of the policies.

Despite the decision in *Concrete Sealants*, most other courts applying Ohio law have held that the term "property damage" encompasses harm to land or buildings necessitating abatement costs. *See Stychno v. Ohio Edison Co.*, 806 F.Supp. 663 (N.D.Ohio 1992) (applying Ohio law) (involving lease agreement but applying law of insurance); *Kipin Industries, Inc. v. American Universal Ins. Co.*, 41 Ohio App.3d 228, 535 N.E.2d 334 (1987); *Buckeye Union Ins. Co. v. Liberty Solvents and Chemicals Co.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984) (this court's interpretation of terms in a pollution exclusion disapproved by *Hybud Equipment Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992)). *See also* Carol A. Crocca, Annotation, *Liability Insurance Coverage for Violations of Antipollution Law*, 87 A.L.R.4th 444 (1991). For example, in *Kipin Industries*, the court held that an insurer had a duty to defend a claim brought by the United States and the State of Ohio against an insured for the clean-up costs of hazardous waste at a waste disposal site. The court stated that "when the environment has been adversely affected by pollution to the extent of requiring governmental action or expenditure or both for the safety of the public, there is 'property damage' whether or not the pollution affects any tangible property owned or possessed exclusively by the government." *Kipin Industries*, 41 Ohio App.3d at 230–1, 535 N.E.2d at 337. Similarly, the claims for abatement costs in *Santiago* fall within the London Market Insurers' coverage for "property damage"

because harm has been done to HANO's buildings which requires remedial steps to make them safely habitable.

The "property damage" in *Spells* and *HANO* also arguably or potentially arose during the period of the London Market Insurers' policies. A number of actions or events conceivably could trigger coverage under the policies for lead paint contamination—e.g., the application of the paint to the buildings' walls or the realization of harm by the buildings' residents.[7] However, the Court need not choose a coverage triggering action or event at this point because, regardless of the trigger chosen, the information provided in the complaints is too vague to rule out the possibility of coverage under the London Market Insurers' policies.

Finally, although an exclusion in the later policies precludes recovery of abatement costs, the London Market Insurers still must defend on the basis of the early policies. The exclusion in the later policies disclaims coverage for claims made against Sherwin–Williams involving:

> the withdrawal, inspection, repair, replacement, or loss of use of the Assured's products or work completed by or for the Assured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

(*See* Appendix.) This exclusion clearly applies to the damages alleged in *Spells* and *HANO*. Nevertheless, because coverage is potentially triggered under all of the London Market Insurers' policies and because the early policies do not contain this exclusion, the London Market Insurers still must defend the *Spells* and *HANO* complaints.[8]

---

7. Generally speaking, there are four different theories regarding trigger of coverage: the manifestation theory, the injury-in-fact theory, the exposure theory, and the continuous or multiple trigger theory. *See Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F.Supp. 474, 478 (E.D.Mich.1989) (discussing various trigger theories). The parties have not briefed the trigger of coverage issue, and the Court is not aware of

any precedent discussing trigger of coverage for property damage caused by lead paint contamination.

8. Because property damage is involved and one of the clauses covering such damage in the early policies does not use the term "accident," it is unnecessary to find that the damage resulted from an "accident" or "occurrence" as was done

### 2. *Possible Misrepresentations and Breaches of the Contracts by Sherwin–Williams.*

The London Market Insurers argue that even if the claims asserted in the lead pigment cases fall within the scope of their coverage, summary judgment should not be granted for Sherwin–Williams. They contend that certain misrepresentations made by Sherwin–Williams raise a question of fact as to whether the contracts of insurance are voidable. Furthermore, they argue that a question of fact exists as to whether Sherwin–Williams breached several of the policy provisions by providing late notice and by failing to cooperate. Finally, they assert that they are entitled to summary judgment with regard to the money already paid by Sherwin–Williams because it constitutes a "voluntary" payment under the policies of insurance. The London Market Insurers bear the burden of proving these sort of affirmative defenses, *see, e.g., Weaver v. Ballard,* 174 Ohio St. 59, 186 N.E.2d 834 (1962) (burden of proving breach of cooperation clause on insurer); 42 Ohio Jur.3d *Evidence & Witnesses* § 109 (1983) (discussing affirmative defenses), and to prevail in a motion for summary judgment Sherwin–Williams need only show that the London Market Insurers could not bear their burden at trial, *Calderone v. U.S.,* 799 F.2d 254 (6th Cir.1986).

#### a. Sherwin–Williams' Alleged Misrepresentations

■ No question of fact is raised by the allegations in the lead pigment complaints that Sherwin–Williams knew of the risk of lead paint and acted to conceal this information. As a general rule, parties to an insurance contract must enter into such contracts with the utmost good faith, and a misrepresentation of a material fact in a policy renders it voidable at the option of the defrauded party. *American Continental Ins. Co. v. Estate of Gerkens,* 69 Ohio App.3d 697, 591 N.E.2d 774 (1990); *Allstate Ins. Co. v. Boggs,* 27 Ohio St.2d 216, 271 N.E.2d 855 (1971). In *Estate of Gerkens,* the court explained that a fact is material if the insurer specifically request-

ed the fact from the insured or if it would have induced the insurer to decline to issue a policy or to request a higher premium.

■ The danger of lead paint, if known and concealed by Sherwin–Williams, would be a material fact under the tests set forth in *Estate of Gerkens,* but the London Market Insurers' evidence on this issue is insufficient to survive a motion for summary judgment. The London Market Insurers rely exclusively on the allegations in the lead pigment complaints concerning Sherwin–Williams' conduct towards paint suppliers and consumers. These allegations are relevant to the question of whether claims are made within the scope of coverage, but are irrelevant to a determination of whether Sherwin–Williams breached its insurance agreement by making misrepresentations to the London Market Insurers. Not only do they fail to make any reference to Sherwin–Williams' relationship with the London Market Insurers, they also are unsupported claims which still must be proved. As such, the allegations in the lead pigment complaints are entitled to no more weight than the allegations in the London Market Insurers' own pleadings. Because no other evidence has been submitted that Sherwin–Williams acted to conceal material facts, this issue need not be tried to the Court.

#### b. Sherwin–Williams' Duty to Provide the London Market Insurers With Reasonable Notice

■ In addition, no question of fact is raised by the alleged untimeliness of Sherwin–Williams' notice to the London Market Insurers. "[L]ate notice relieves the insurer of its obligations under the policy only if the insurer demonstrates prejudice as a result of the delay." *West Am. Ins. Co. v. Hardin,* 59 Ohio App.3d 71, 73, 571 N.E.2d 449, 452 (1989). A requirement of immediate notice under a contract for insurance means notice within a reasonable amount of time under the circumstances of the case. *Zurich Ins. Co. v. Valley Steel Erectors, Inc.,* 13 Ohio App.2d 41, 233

---

for the other lead pigment complaints. *See*

Section A(1)(a) *supra.*

N.E.2d 597 (1968). If notice was not given within a reasonable amount of time, then an insurer is entitled merely to a rebuttable presumption of prejudice. *American Employers Ins. Co. v. Metro Regional Transit Auth.*, 802 F.Supp. 169 (N.D.Ohio 1992) (applying Ohio law).

Even though the London Market Insurers are entitled to a presumption of prejudice, they cannot prevent a summary judgment in Sherwin–Williams' favor on the basis of this presumption alone. Notice was given in four of the lead pigment cases within approximately four months of the time suit was filed and, in the fifth case, within six months. While these facts give rise to the presumption of prejudice, it is rebutted by the evidence that Sherwin–Williams adequately safeguarded the London Market Insurers' interests by assuming the defense of the lead pigment cases. Because of Sherwin–Williams' control over the cases, it was incumbent upon the London Market Insurers to point to some actual prejudice caused by the late notice, but they chose to rely exclusively on the rebuttable presumption raised by the law. In the absence of some other evidence of prejudice, no question of fact exists for trial.

### c. Sherwin–Williams' Duty to Cooperate

Similarly, no questions of fact are raised by Sherwin–Williams alleged failure to cooperate under the policies. In some circumstances, an insurer may be relieved of further obligation with respect to a claim if its insured fails to cooperate as required in the insurance policy. *Travelers Indemnity Co. v. Cochrane*, 155 Ohio St. 305, 98 N.E.2d 840 (1951); *State Farm Mut. Auto Ins. Co. v. Holcomb*, 9 Ohio App.3d 79, 458 N.E.2d 441 (1983). "It would be obvious, however, that the failure of cooperation must prejudice the material rights of the insurer before the insured's conduct would warrant cancellation of the policy." *Holcomb*, 9 Ohio App.3d at 81, 458 N.E.2d at 445.

Even though the London Market Insurers might have been entitled to more information under the insurance policies, there is no evidence that their material rights were prejudiced. It is undisputed that Sherwin–Williams failed to forward the complete case files as they had done in the past, but the London Market Insurers apparently had enough information on each lead pigment case to reserve their rights under the policies and to refuse coverage. Furthermore, given that the practice between the parties was for Sherwin–Williams to control its own defense, it is difficult to understand why the London Market Insurers would need the complete case files in each of the cases—a fact which the London Market Insurers fail to address in their memoranda. In the unique circumstances of this case, it cannot be said that a question of material fact exists simply because Sherwin–Williams failed to give duplicates of every piece of paper filed in the lead pigment cases to the London Market Insurers.

### d. Sherwin–Williams' Alleged Voluntary Payments

Finally, the London Market Insurers are not entitled to summary judgment that Sherwin–Williams' payments in connection with the lead pigment cases were made voluntarily. The London Market Insurers argue that these payments were made voluntarily because no prior permission was obtained as required by the insurance agreements. All of the policies between the parties contain some provision governing payments made without the London Market Insurers' consent. For example, the early policies state:

> The Insured shall not make any admission of liability, either before or after an accident, nor shall he, except at his own cost, incur any expense, make any payment, or settle any claim, nor shall he interfere in any negotiations for settlement or in any legal proceeding with respect of any injury for which the Underwriters shall be liable under this Policy, without, in each case, the authority of the Underwriters.

(Ex. 1 to Goldsmith Aff.)

The purpose of this sort of provision was explained in *American Employers Ins. Co. v. Metro Regional Transit Auth.*, 802

F.Supp. 169 (N.D.Ohio 1992) (applying Ohio law). In *American Employers,* the court considered the arguments of an insurer that its insured expended money on certain cases without the insurer's prior permission. In the process of reaching its decision, the court examined the prior permission clause and stated that the clause is designed:

> to prevent collusion and to confer upon the insurer complete control and direction of the defense and/or settlement of the claims and suits. *Where the insurer refuses to defend and thereby chooses not to exercise its right to control and direct the defense, the clause fails of its essential purpose and the insured has no choice but to undertake the defense itself.* If the insurer is subsequently held to breach its duty to defend, reasonable costs incurred by the insured in making his defense will have to be assumed by the insurer.

*Id.* at 183 (citations omitted) (emphasis added). Thus, the *American Employers* court held that the insured had a right to be reimbursed for its expenditures despite the fact that it had failed to obtain prior permission from the insurer.

The court's reasoning in *American Employers* is perhaps even more pertinent here because Sherwin–Williams has always, by the agreement of both parties, controlled its own defense and then sought reimbursement. Having allowed and encouraged Sherwin–Williams to incur expenses without pre-approval in past cases, the London Market Insurers cannot now claim that such costs are unreimbursable, provided that they were reasonable and necessary for the defense of covered litigation.

B. The London Market Insurers' Duty to Pay Attorneys' Fees for this Declaratory Judgment Action and Prejudgment Interest

■ Because the London Market Insurers had a duty to defend in the lead pig-

ment cases, Sherwin–Williams is entitled to an award of attorneys' fees for this declaratory judgment action as well as prejudgment interest. As the court explained in *City of Willoughby Hills v. Cincinnati Ins. Co.,* 26 Ohio App.3d 146, 499 N.E.2d 31 (1986) (syllabus):

> The insured is entitled to recover from its insurer the costs, including expenses and attorney fees, of prosecuting a successful declaratory judgment action to enforce the duty of the insurer to defend. In addition, the insured is entitled to prejudgment interest from the date those costs, expenses and attorney fees were incurred.

Furthermore, the *Willoughby Hills* court specifically held that such fees and interest were recoverable regardless of the insurer's good or bad faith in refusing to defend. *See also Turner Construction Co. v. Commercial Union Ins. Co.,* 24 Ohio App.3d 1, 492 N.E.2d 836 (1985) (insurer's good faith is irrelevant to its liability for insured's legal fees and expenses in action to enforce duty to defend clause of contract); *American Employers,* 802 F.Supp. at 184 (characterizing an assertion that bad faith is necessary in order to award attorneys' fees in a declaratory judgment action as "a blatant misstatement of the law"). Thus, attorneys' fees and prejudgment interest do not appear to be discretionary awards under Ohio law when, as here, an insurer has breached its duty to defend an insured.

C. Conclusion

Accordingly, the London Market Insurers have a duty to defend the lead pigment cases filed against Sherwin–Williams. Sherwin–Williams is free to seek defense costs for the *Santiago* action under any of the policies from 1972 to 1978, for the *City of New York* and *City of Philadelphia* actions under any of the policies from 1936 to 1980, and for the *Spells* and *HANO* actions under any of the policies from 1936 to 1964.[9] Jurisdiction is maintained for the

---

**9.** It is unnecessary, as the London Market Insurers argue, for defense costs to be apportioned in this action either between the London Market Insurers and Sherwin–Williams, or between the London Market Insurers and Sherwin–Williams' other insurance companies. Defense costs must

purposes of determining the award due Sherwin–Williams pursuant to this Order in light of the hold harmless agreements and for resolving the remaining issues between the parties concerning indemnification.

IT IS SO ORDERED.

## APPENDIX

The early policies in effect between the parties require the London Market Insurers to indemnify Sherwin–Williams for all sums for which the Assured is liable for damages:

(a) for bodily injuries to any person or persons not in the Assured's service sustained by accident, sickness and disease, whether resulting fatally or otherwise, by reason of and during all operations and work undertaken by the Assured ... connected chiefly with, but not limited to, the manufacture, sale, advertising, distribution and storage of all merchandise and materials manufactured, sold or handled by the Assured; and by reason of the existence, possession, consumption or use of any product manufactured, sold, handled, demonstrated, delivered or distributed by the Assured.

(b) for damage to or destruction of property ... caused solely and directly by accidents occurring, while this Policy is in force, by reason of any and all operations of the Assured.

(c) on account of any claim made against the Assured as respects damage to or destruction of property, including loss of use of such property ... by reason of the existence, possession, consumption or use of any product manufactured, sold, handled, demonstrated, delivered or distributed by the Assured.

(Ex. N to Berkshire Aff. II.)

After the revision in the mid–1960s, the London Market Insurers agreed to cover Sherwin–Williams for:

all sums which the Assured shall be obligated to pay by reason of the liability

(a) imposed upon the Assured by law,

. . . . .

for damages on account of:

(1) Personal Injuries, including death at any time resulting therefrom,

(2) Property Damage, including the loss of use thereof

. . . . .

caused by or arising out of each occurrence happening anywhere in the world. (Ex. 3 to Goldsmith Aff.; Ex. N to Berkshire Aff. II.)

These later policies provide definitions for the terms "personal injuries," "property damage," and "occurrence." "Personal injuries" are defined as:

bodily injury, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities.

(*Id.*) "Property damage" is defined as "the loss of or direct damage to or destruction of tangible property," (*Id.*), and "occurrence" as:

an accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury or property damage or a claim in respect of Errors or Omissions during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

(*Id.*)

These policies also contain exclusions which the London Market Insurers' claim might be applicable to the lead pigment cases. Specifically, the policies provide that they do not apply:

only be apportioned when the insurer "produces undeniable evidence of the allocability of specific expenses; the insurer having breached its contract to defend should be charged with a heavy burden of proof of even partial freedom of liability for harm to the insured which ostensibly flowed from the breach." *Hogan v. Mid-* land Nat. Ins. Co., 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970), *cited in Insurance Company of N. Am. v. Forty–Eight Insulations*, 633 F.2d 1212 (6th Cir.1980). The London Market Insurers have made no showing that defense costs in any of the lead pigment cases can be readily apportioned.

(b) to claims made against the Assured:

(i) on account of Personal Injuries or Property Damage resulting from the failure of the Assured's products or work completed by or for the Assured to perform the function or serve the purpose intended by the Assured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Assured; but this exclusion does (i) does not apply to Personal Injuries or Property Damage resulting from the active malfunctioning of such products or work;

(ii) on account of Property Damage to the Assured's products arising out of such products or any part of such products;

. . . . .

(iv) for the withdrawal, inspection, repair, replacement, or loss of use of the Assured's products or work completed by or for the Assured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

(*Id.*)