**NL INDUSTRIES, INC., Plaintiff,**

**v.**

**COMMERCIAL UNION INSURANCE COMPANY, et al., Defendants,**

**v.**

**CERTAIN UNDERWRITERS AT LLOYD'S, et al., Third Party Defendants.**

**Civ. No. 90–2124.**

United States District Court, D. New Jersey.

Aug. 6, 1993.

As Amended Sept. 24, 1993.

McCarter & English by Kevin J. Connell, Andrew T. Berry, Newark, NJ, and Kirkland & Ellis by Samuel A. Haubold and David T. Erie, Chicago, IL, for plaintiff.

Rivkin, Radler & Kremer by David M. Cassidy, Howard M. Tollin, and Richard S. Feldman, Uniondale, NY, for Commercial Union.

Peterson & Ross by Terry Cosgrove, Stephen M. Hoke, and Julia Core, Chicago, IL, for London Ins. Co.

Mudge, Rose, Guthrie, Alexander & Ferdon by Paul Koepff, Joseph E. Boury, and Christina Luancing, New York City, for I.N.A.

German, Gallagher & Murtagh by Shelby L. Mattioli, Philadelphia, PA, for Stonewall Underwriters.

Feinberg & Tritsch by John Krug, Livingston, NJ, for Allstate Ins. Co.

De Maria, Ellis, Hunt, Salsberg & Friedman by Jonathan S. Reed, Newark, NJ, for Evanston Ins. Co.

## OPINION

PISANO, United States Magistrate Judge:

### INTRODUCTION

This matter comes before the Court on plaintiff NL Industries' (NL) motion for summary judgment against defendant Commercial Union (CU) on liability for certain claims added in NL's second amended complaint. Opposition was submitted in response to this motion by CU, and CU also filed a cross-motion for summary judgment. NL and third party defendants Certain Underwriters at Lloyd's London and British Companies submitted opposition in response to CU's cross-motion. Oral argument was heard on May 13, 1993. The parties have consented to the jurisdiction of this Court, pursuant to 28 *U.S.C.* 636(c).

### BACKGROUND

The parties are engaged in two actions pending in this Court. The instant action, Civil Action No. 91–2124, is NL's claim for payment of defense costs incurred in seven lead paint liability cases. The companion case, Civ. Action No. 91–2125, is NL's suit for insurance coverage on some three hundred and eighty five (385) claims for product liability or environmental cleanup. The motions which are being decided in this action relate to the "lead paint" claims of Civil Action No. 91–2124.

CU and the third party defendants are insurance carriers who have been sued for liability and indemnity coverage, and for reimbursement of plaintiff's defense costs and counsel fees.[1] For a variety of reasons, defendants have denied NL coverage under these policies.

The insurance policies NL obtained from CU provided primary comprehensive general liability coverage for third party bodily injury from February 1, 1966 to January 1, 1978, and for third party property damage claims against NL from February 1, 1970 to January 1, 1978. (NL's Statement of Undisputed Facts at 2). Each policy contained the following standard clauses:

[T]he company shall have the right and duty to defend any suit against the insured seeking damages an account of bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

*Id.* at 3.

The company will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of

Coverage A bodily injury

Coverage B property damage

(London Brief in Opp. at 10).

In contrast, the policies issued by the third party defendant carriers to NL provided coverage only for property damage, from the period of November 19, 1949 to May 1, 1970. (London Brief in Opp. at 11). Those policies issued from May 1, 1958 to May 1, 1970 provided coverage for product liability claims. There is a dispute between the parties as to whether the pre-May 1, 1958 policies provided coverage for product liability claims. *Id.* In addition, these policies are "lost policies", meaning that copies of the policies cannot be located. (London Brief in Opp. at 6). NL and the London Insurers have entered into a stipulation regarding the reconstructed terms and conditions of the policies. *Id.,* fn. 2. The policies contain the following coverage and liability provisions:

1. Coverage. From and against all loss, costs, damages, attorney fees and expenses of whatever kind and nature which the Assured may sustain or incur by reason of or in consequence of:

(a) Any and all liability imposed by law against the Assured *for damage to or destruction of property of others....* (Emphasis added).

\* \* \* \* \* \*

3. Limits of Liability. It is expressly agreed that the agreement of the Underwriters to indemnify attaches only when the liability imposed by law upon the Assured exceeds ... [the deductible] ... *provided the occurrence out of which any*

---

**1.** The discovery disputes of these parties was the subject of an Opinion & Order filed by this Court

in *NL Indus., Inc. v. Commercial Union Ins. Corp.,* 144 F.R.D. 225 (D.N.J.1992).

*claims or claims arise occur during the life of this policy.* (Emphasis added). *Id.* at 12.

On July 1, 1991, the Honorable H. Lee Sarokin granted NL's motion for summary judgment on liability against CU.[2] It was held, as a matter of law, that CU had a duty to defend NL with respect to the three lead paint claims in NL's original complaint. These claims are: *Santiago v. Sherwin–Williams Co.*, No. 87–2799–T (D.Mass. Nov. 24, 1987); *The City of N.Y. v. Lead Indus. Assoc. Inc.*, No. 14365/89 (N.Y.Sup.Ct. June 7, 1983); *Housing Auth. of New Orleans v. Standard Paint & Varnish Co.* (HANO), No. 90–6901 (La.Pelt. Apr. 9, 1990). Judge Sarokin ruled that CU had a duty to defend NL under the terms of the insurance policies it had insured, and, because CU had wrongfully refused to provide a defense, NL was entitled to be reimbursed for its legal fees and costs incurred. It was held that "[defendant's] duty to defend was translated into a duty to reimburse." *NL Indus.*, No. 91–2124, at 18, 1991 WL 398678.

After the matter had been referred to the undersigned for a trial on damages, the parties reached a settlement which governed the manner in which NL would be reimbursed for its expenses billed by its counsel, Kirkland & Ellis (K & E). The parties consented to the jurisdiction of this Court for all purposes, pursuant to 28 *U.S.C.* § 636(c), during the course of the damages trial and settlement negotiations.

Meanwhile, four new "lead paint" claims had been brought against NL. NL now seeks coverage for a defense from CU. When CU refused to provide coverage under its policies, NL filed a second amended complaint which served to add these four claims to the pending action: *Orleans Parish School Bd. v. Apex Sales Co.*, No. 91–6014 (filed in La.Pelt. on July 22, 1991); *Swartzbauer v. Lead Indus. Assoc., Inc.*, No. 91–3948 (filed in E.D.Pa. on June 21, 1991); *Hurt v. Phila. Housing Auth.*, No. 91–4746 (filed in E.D.Pa. on July 25, 1991); *City of Phila. and Phila. Housing Auth. v. Lead Indus. Assoc., Inc.*,

No. 90–7064–JG (filed in E.D.Pa. on Nov. 5, 1990). These claims involve nearly identical circumstances as those in the three original lead paint claims.

NL has brought a motion for summary judgment on the four new claims, alleging that "CU's refusal to honor its defense obligations for the new lead paint claims in the face of this Court's prior opinion is nothing more than a deliberate ploy to evade or stall the payment of defense costs that cannot be reasonably disputed." (NL's Memo. in Support at 2). NL is requesting it be awarded attorneys' fees and costs for having to file the motion, pursuant to *Fed.R.Civ.P.* 11 and *N.J.Ct.R.* 4:42–9(a)(6). CU contends that NL breached the notice and cooperation provisions of the policies in issue, raised claims of intentional torts not covered by the policies, and failed to allege facts with respect to the *Orleans Parish* claim that would trigger CU's defense obligations. CU argues, therefore, that it has no duty to defend these claims.

## ANALYSIS

### Standard of Review

Pursuant to *Fed.R.Civ.P.* 56(c), summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* In making this determination, a court must draw all inferences in favor of the nonmovant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 fn. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). If no reasonable trier of fact could find for the nonmoving party, however, summary judgment must be granted. *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989).

### NL's Motion for Summary Judgment

1. The Law of the Case Doctrine

■ Pursuant to the law of the case doctrine, "once an issue is decided, it will not be

**2.** *NL Indus., Inc. v. Commercial Union Ins. Co.*, No. 90–2124, 1991 U.S. Dist. WL 398678 (D.N.J. July 11, 1991).

relitigated in the same case, except in unusual circumstances." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d· 162, 165 (3rd Cir. 1982). The purpose of the doctrine is to promote final and efficient administration of cases. *Id.*

CU's duty to defend NL on the claims of lead poisoning and the choice of law issue have already been adjudicated by this Court in *NL Indus., Inc. v. Commercial Union Ins. Co.*, No. 90–2124, 1991 U.S. Dist. WL 398678 (D.N.J. July 11, 1991). The four new complaints which are the subject of this opinion present precisely the same claims as those adjudicated in Judge Sarokin's Opinion.[3] This Opinion has never been appealed, thus the. law of the case doctrine prevents this Court from relitigating either of these issues again.[4]

In *Orleans Parish*, the school board brought suit against NL and other producers and manufacturers of lead pigment and paint, to recover costs for a lead abatement program. (NL's Statement of Undisputed Facts at 2). The program requires all lead paint to be removed from the school buildings, and for the allegedly contaminated coils to be removed and replaced. *Id.* The claim therefore contains allegations of property damage.

The *Orleans Parish* claim is identical to the HANO claim in that the plaintiffs in HANO sought indemnification and/or contribution for abatement costs. *NL Indus.*, No. 91–2124 at 27, 1991 WL 398678. HANO entered into a consent judgment in the *Mitchell* action, a class action suit which sought "to compel the Housing Authority of New Orleans to comply with certain Federal Regulations regarding lead abatement. ... As a result of this consent judgment, the Housing Authority of New Orleans has incurred expenses and will continue to incur expense in the future associated with the duties and obligations imposed upon it by said judgment." *Id.* at 26. The court found that CU had a duty to defend because "under

New Jersey law, [there is no question that] an insured's damages include abatement costs in order to avoid future bodily injury and property damage to third parties." *Id.* at 29–30.

The *Swartzbauer* claim is similar to the *Santiago* claim. In *Swartzbauer*, over 21,000 painters and their spouses brought suit to recover present and future bodily injury damages for having been occupationally exposed to lead paint and lead pigment products. (NL's Statement of Undisputed Facts at 6). Plaintiffs allege that their injuries resulted from lead paint being placed in the stream of commerce during the years of plaintiffs' employ, and that from 1928 to 1978, defendants promoted the use of lead pigment in paint. *Id.*

In the *Santiago* action, it was alleged that a small child ingested paint containing NL pigment and was diagnosed in 1973 as suffering from lead poisoning. *NL Indus.*, No. 91–2124 at 15, 1991 WL 398678. The child later developed mental retardation. *Id.* CU conceded that the claim· occurred during plaintiff's policy period, and that the policy covered that type of claim. *Id.* at 21. The only arguments raised by CU were that the allegations of conspiracy in the complaint defeated defendant's duty to defend, and that NL breached the notice provisions in the policy. *Id.* These arguments were rejected by the court. *Id.* at 21–22. CU was therefore ordered to defend on the claim of bodily injury.

*Hurt* is a class action lawsuit brought in Pennsylvania. Plaintiffs are residents of the Philadelphia Housing Authority who seek damages for bodily injury and/or the threat of injury from exposure to lead-based paint in and/or on their homes which were built or repainted before 1978. *Id.* Plaintiffs also seek to recover the cost of abatement of the alleged hazards, and for the removal of the lead. *Id.* The *Hurt* claim is similar to both *Swartzbauer* and *Santiago* on its allegations of bodily injury.

---

3. The three claims in Judge Sarokin's Opinion involved third party bodily injury and/or property damage allegedly caused by lead pigment manufactured by NL.

4. This Court notes that CU could be ordered to provide NL with a defense on the basis of the law of the case doctrine alone. However, NL is requesting attorney's fees in this matter, so a thorough analysis has been undertaken of *all* of CU's arguments.

The last of the four new claims is the *City of Phila.* claim. This claim is "brought on behalf of a putative class defined to include all cities in the United States with a population over 100,000 persons, and their housing and/or public health authorities are engaged in or contemplating a lead paint abatement program." *Id.* at 8. Plaintiffs seek to recover damages for:

1. their liability costs in bodily injury actions based on alleged lead poisoning of residents;

2. the costs of abating alleged lead paint hazards in the city owned, managed and/or operated buildings;

3. the costs of abating alleged paint hazards in private residential buildings where serious hazards are supposedly known to exist; and

4. costs of treating residents for any exposure that might have occurred.

*Id.*

Plaintiffs allege that "from the early 1900s to 1977, NL processed, manufactured, designed, developed, tested, packaged, inspected, sold, distributed, supplied, delivered and/or marketed lead pigments for use in lead paint that was used on interiors of surfaces in properties within plaintiff's jurisdiction." *Id.* at 8–9. The injuries alleged are the same type as those in the *City of N.Y.* claim.

In the *City of N.Y.*, the city sued NL for the cost of removing and replacing the lead paint from city owned residential properties, and for the cost of defending claims filed against the city based on ingestion of lead paint. *Id.* at 15. Plaintiff brought the action in its capacity as landlord of the housing units which, up until 1959, contained lead paint. *Id.* at 22. Plaintiff alleges, however, that the flaking of the paint is continuous, and thus claims three types of damages totalling over $50 million:

1. property damage to the housing units in the sense that plaintiff has been deprived of "the quiet use and enjoyment of [its] property and buildings thereon have been interfered with and damage by lead paint hazards;

2. exposure to 78 different lawsuits against the City "in which numerous plaintiffs allege injury and damages due to ingestion, inhalation or absorption of lead from paint in buildings throughout the City";

3. "other related damages, including, but not limited to, the costs of inspecting, testing, and maintaining and, where necessary, abating lead paint hazards in buildings throughout the City, and the costs of screening, testing, diagnosing, treating and educating individuals with respect to lead poisoning."

*Id.* at 22–23. Plaintiff further asserts a "Fraud and Misrepresentation" cause of action, in addition to its negligence counts. *Id.* at 23.

The court did not address whether the flaking of lead paint and the costs of abatement constitute property damage or a business risk, but it did find that CU had a duty to defend the complaint as a whole; so long as the complaint alleges a claim potentially within the coverage of the policy, the insurer must defend the complaint in its entirety. *Id.* at 25.

CU attempts to distinguish the four new claims from the three original ones on the basis of the number of paragraphs in the complaint. Defendant notes that the *Santiago* complaint contains a smaller number of paragraphs and causes of action than does *Hurt* or the *City of Phila.*. CU also states that there is an exception to the law of the case doctrine, which applies here, namely that "every court has a 'duty' to apply a supervening rule of law when the new legal rule is valid and applicable to the issues of the case." (CU's Memo. in Reply at 23). Defendant cites *Hayman Cash Register* for the proposition that "the law of the case doctrine is not an iron-clad rule," and that several exceptions exist which permit reconsideration of previously litigated issues. *Hayman Cash Register*, 669 F.2d at 170.

CU is referring to *SL Indus., Inc. v. American Motorists Ins. Co.*, 128 N.J. 188, 607 A.2d 1266 (1992) as the supervening rule of law which creates an exception to applying the law of the case doctrine here. CU contends that *SL Indus.* directs this Court to

apportion NL's defense expenses between those claims which are potentially covered and those that are not. (CU Memo. in Reply at 23. Defendant claims that:

> [W]here, as here, the alleged injury is a probable result of alleged fraud, the law presumes a subjective intent to cause the injury and there is no coverage. Thus, the claims for fraud, conspiracy and concert of action, and intentional and willful acts of misrepresentation are clearly non-covered claims.

*Id.* at 24.

CU's reasoning is overly simple. A more careful reading of *SL Indus.* demonstrates that the decision did not stand for such a broad proposition.

*SL Indus.* is an employment law case; plaintiff brought action under the age discrimination and fair labor acts, and also claimed common law fraud. The New Jersey Supreme Court found that the statutes did not permit recovery of compensatory damages for emotional injuries, therefore those claims could not be potentially coverable under the insurance policies at issue. *SL Indus.*, 128 N.J. at 197–198, 607 A.2d 1266. Also, the Court had initially held that defendant did not have to defend the fraud claim, because the complaint originally failed to allege that any personal injury resulted from the fraud. *Id.* at 198, 607 A.2d 1266. However, during discovery, it became clear that personal injury was alleged, consequently the court held that the fraud claim triggered defendant's duty to defend.[5] *Id.*

NL argues that *SL Indus.* is distinguishable because:

> Thus, unlike the claims here, plaintiff's claims in *SL Industries* were not even arguably covered when SL Industries first tendered the claims to its insurer. *Id.* It was only subsequently when information gathered during discovery revealed that in the common law claim, the insured was in

fact seeking recovery for a personal injury. *Id.* [607 A.2d] at 1276. Later, both claims were settled without adjudication.

(NL Memo. in Reply at 11).

NL's position is correct. *SL Indus.* is distinguishable from the situation at bar. In *SL Indus.*, the allegedly covered claim only became known during the course of the litigation. Here, CU has known that NL has had potentially coverable claims from the inception of the lawsuit.

Second, the *SL Indus.* court addressed the issue of apportionment between the non-covered statutory claims and the potentially covered fraud claim only after the indemnity issue had been decided. The general rule regarding apportionment of defense costs is that "when the insurer has wrongfully refused to defend an action and is then required to reimburse the insured for its defense costs, its duty to reimburse is limited to allegations covered under the policy, *provided that* the defense costs can be apportioned between covered and non-covered claims." *SL Indus.*, 128 N.J. at 214–215, 607 A.2d 1266. Where defense costs cannot be apportioned, the insurer must assume the cost of defending both the covered and non-covered claims. *Id.* at 215, 607 A.2d 1266. However, the fact that insurers, insureds, and the courts will rarely be able to determine the allocation of defense costs "with scientific certainty" is not a justification for "imposing all of the costs on the insurer by default." *Id.* at 216, 607 A.2d 1266.

In the case at bar, the defense costs cannot be apportioned. All of NL's claims are potentially coverable, therefore there is nothing to apportion.

Furthermore, NL makes the practical argument that

> *SL Industries* is no authority for permitting an insurer to escape a clear obligation based on complaint allegations triggering a duty to defend by asserting a set of facts

---

5. The Court stated:

> Insureds expect their coverage and defense benefits to be determined by the nature of the claim against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured.... To allow the insurance company "to construct a

> formal fortress of the third party's pleadings and to retreat behind its walls, thereby successfully ignoring true but unplead facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense" would not be fair.

*Id.* at 199, 607 A.2d 1266.

outside the complaint that might ultimately defeat an insured's right to indemnify. If CU's position were accepted, there would be no difference between the dimensions of the duty to defend, which depend on complaint allegations, and the dimensions of the duty to indemnify, which may depend on facts outside the complaint.

(NL Memo. in Reply at 12).

CU's suppositions cannot override the law of the case. *SL Indus.* does not serve as an exception to Judge Sarokin's rulings; rather, *SL Indus.* confirms the established rule that an insurer has a duty to defend all potentially coverable claims. As the following section of the Opinion demonstrates, every claim made against NL is potentially coverable under the policies issued by CU, therefore apportionment is not applicable to this case, and CU must provide NL with an entire defense.

Regarding the choice of law issue, Judge Sarokin has already held that New Jersey law will apply to this action. *NL Indus.*, No. 91–2124 at 8, 1991 WL 398678. "[D]espite the fact that the insurance contracts were negotiated and executed in another state ... New Jersey has a strong public interest in insuring that environmental contamination within the state will be remedied." [6] The court based its holding on the following facts:

> New York's only contact is the signing of the contract, whereas this case involves a New Jersey corporation with New Jersey operations seeking indemnity for New Jersey claims. These contacts together suggest New Jersey's dominant relationship, and, as in *National Starch*, New Jersey's strong public interest in the clean-up of New Jersey sites tips the balance. Therefore, the court will interpret NL's insurance contract with CU according to New Jersey law.

*Id.* at 13. *See also The Gilbert Spruance Co. v. Pennsylvania Manufacturers Assoc., Ins.*

Co., 134 N.J. 96, 629 A.2d 885 (1993) (court adopted site-specific approach).

Thus, CU's duty to defend and the application of New Jersey law are the law of the case, as concerns the motion at bar.

### 2. Duty to Defend

■ Generally speaking, the rule of law regarding an insurer's duty to defend is that an insurer must defend a claim against the insured, if the complaint alleges facts which brings the action within the policy period, and which falls under the terms of the coverage. *See NL Indus.*, No. 90–2124 at 16, 1991 WL 398678, citing *Burd v. Sussex Mut. Ins. Co.*, 56 N.J. 383, 388, 267 A.2d 7 (1970). The duty to defend arises when a claim is presented initially, not after the validity of the claim has been established. *Cooper Lab., Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 675 (3rd Cir.1986).

Third Circuit case law in particular holds that "[u]nless a complaint on its face precludes the possibility that any portion of the continuous process of injury fell within the policy period of a policy, that policy creates an obligation for the entire cost of defense against the claim." *Lac D'Amiante Du Quebec v. Am. Home Assur.*, 613 F.Supp. 1549, 1563 (D.N.J.1985). An insurer must provide a defense "if the allegations of the complaint 'state on their face a claim against the insured to which the policy *potentially* applies.'" *C.H. Heist Caribe Corp. v. Am. Home Assur.*, 640 F.2d 479, 483 (3rd Cir. 1981), citing *C. Raymond Davis & Sons, Inc. v. Liberty Mut. Ins. Co.*, 467 F.Supp. 17, 19 (E.D.Pa.1979) (emphasis in original). In addition, any "doubts as to the existence or extent of coverage must generally be resolved in favor of the insured." *Broadwell Realty v. Fidelity & Cas.*, 218 N.J.Super. 516, 524, 528 A.2d 76 (App.Div.1987). *See also Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 305, 208 A.2d 638 (1965) ("we have consistently construed policy [language] strictly against the insurer and where several

---

**6.** In a footnote, the Court noted that

Although the "lead paint" cases are the subject of a separate action, plaintiff seeks a declaratory judgment of defendant's liability for those three particular claims in the "environmental action" as well. Thus, the court must apply the same substantive law in both the "lead

paint" and "environmental" actions, or else the parties rights and obligations under the policy as it applies to the "lead paint" claims would be interpreted according to two states' substantive laws.

*Id.* at fn. 3.

**1162**

interpretations were permissible, we have chosen the one most favorable to the [insured]").

CU primarily contends that NL has breached the notice provisions and the cooperation clause in the policies, expected the injuries alleged in the four new actions, and, with respect to the *Orleans Parish* complaint, fails to demonstrate that bodily injury or property damage are alleged which would trigger CU's defense obligations. CU also halfheartedly argues that the claims may not fall within the policy periods, "[b]ecause the complaints are silent as to when the alleged injuries, if any, occurred, [therefore] it is equally likely that those injuries took place when NL was covered by another insurer or was self-insured." (CU's Memo. in Support at 4)..

### 3. Expected or Intended Conduct

CU claims that it is entitled to summary judgment as a matter of law because:

> All four complaints at issue in this motion contain numerous allegations of intentional torts committed by NL. Intentional torts are not covered under the Commercial Union policies.... Moreover, documents produced in discovery show that NL knew about the hazards of lead paint but acted intentionally to conceal those hazards and to mislead the public as to the safety of lead paint. Under these circumstances, the determination of Commercial Union's duty to defend should be based on the actual facts. Those facts establish that the alleged injuries, if any, were not unexpected or unintended by NL.

(CU's Brief in Opp. at 1). CU attributes NL's knowledge of the hazards of lead paint from NL's "intimate involvement on the LIA Executive Committee, LIA Board of Directors, participation in LIA meetings and activities, and receipt of reports that LIA sent to its members...." *Id.* at 4.

 It is first noted that the four complaints at issue do not solely contain allegations of intentional torts; they also assert

claims for negligence.[7] Second, the fact that intentional torts are alleged does not relieve an insurer of its duty to defend. In *NL Indus.*, Judge Sarokin found New Jersey to be clear on the proposition that:

> The fact that there are claims against the insured alleging intentional and willful actions does not excuse the carriers from their duty. If the claims are mixed or based on conflicting theories, one which requires coverage and one which does not, the carrier has no choice, it must defend.

*NL Indus.*, No. 91–2124, at 20–21, 1991 WL 398678, citing *Jackson Tp. v. Hartford Acc. & Indem.*, 186 N.J.Super. 156, 165, 451 A.2d 990 (Law Div.1982). *See also Mt. Hope Inn v. Travelers Indem. Co.*, 157 N.J.Super. 431, 440, 384 A.2d 1159 (Law Div.1978) (if the claim states two conflicting theories, one of which requires coverage, the carrier has no choice but to defend).

The policies in issue prohibit coverage unless the pollution is sudden or accidental. Sudden or accidental "can be interpreted as simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the *injury* was 'neither expected nor intended.'" *Voorhees*, 128 N.J. at 182, 607 A.2d 1255, quoting *Jackson Tp.*, 186 N.J.Super. at 164, 451 A.2d 990. Occurrence is defined under the policy as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (NL's Statement of Undisputed Facts at 3). A recent opinion by the New Jersey Supreme Court discussed the interpretation of "sudden and accidental" in a standard pollution exclusion clause, and held that:

> [T]he phrase does not characterize or relate to the *damage* caused by pollution but instead narrowly limits the kind of "discharge, dispersal, release or escape" of pollutants ... we discern that the phrase "sudden and accidental" in the standard

7. CU contends that the complaints assert claims for negligence because "the flexibility of modern pleading rules permits the assertion of alternate claims for relief and negligence claims impose a lower burden of proof on the plaintiffs than claims of intentional torts." (CU's Brief in Opp. at 18). While this may be CU's opinion, the law does not require an analysis of whether negligence is being plead according to current pleading standards.

pollution-exclusion clause describes only those discharges, dispersals, releases, and escapes of pollutants that occur abruptly or unexpectedly and are unintended.

*Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of America,* 134 N.J. 1, 28–29, 629 A.2d 831 (1993).

Even though case law is unequivocal on the proposition that allegations of mixed conduct alone do not defeat a duty to defend, this court must also engage in an analysis of NL's intent, because a finding of an intent to injure may defeat a duty to defend. *Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 182, 607 A.2d 1255 (1992). The analysis focuses on whether an intent to injure can be presumed from the objective circumstances:

> A case-by-case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances [exist] that objectively establish the insured's intent to injure." *Voorhees, supra,* 128 *N.J.* at 185 [607 A.2d 1255]. Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

*Morton Int'l, Inc. v. Gen. Acc. Ins. Co. of America,* 134 N.J. at 86, 629 A.2d 831 (1993). Thus, the analysis centers on whether the insured intentionally discharged a known pollutant, not on whether any resulting property damage was intended or expected.[8]

An intent to injure is not presumed where negligence is alleged, as recent case law holds that "[a]n allegation of negligence presumes the absence of an intent to injure." *Id.* 128 N.J. at 84, 607 A.2d 1255. In *Voorhees,* for example, the complaint contained allegations of intentional and reckless conduct, as well as an allegation of negligent infliction of emotional distress. *Id.* The court held that the insurer had a duty to defend until the negligence claim was dismissed. *Id.*

The claims against NL contain allegations of both intentional and negligent harm.[9] According to *Voorhees,* CU can be ordered to defend NL on the existence of the negligence claims alone. In any event, however, a review of the intentional tort claims reveal that there are no direct allegations that NL intended to cause lead poisoning.[10] CU argues that since NL was a member of the Lead Industry Association (LIA), an association which receives newspaper clippings and other information which detail the effects of lead paint, NL knew "of the health hazards of lead paint."[11] (CU's Brief in Opp. at 19). Yet, it was established in *The Sherwin–Williams Co. v. Certain Underwriters at Lloyd's of London,* 813 F.Supp. 576 (N.D. Ohio 1993) that knowledge of a risk is not enough to show intent to injure:

> Although Sherwin–Williams allegedly acted with a knowledge of the risks posed by lead-based paint, [the complaint] does not allege that the company acted with the intent of injuring consumers or their children. If knowledge of certain risks by a

---

**8.** In *Morton Int'l,* the Supreme Court acknowledged the "impracticality of adherence to the general rule that 'we will look to the insured's subjective intent to determine intent to injure.'" *Id.* 134 N.J. at 85, 629 A.2d 831, quoting *Voorhees,* 128 N.J. at 185, 607 A.2d 1255.

**9.** *See* NL Exhibits: *Orleans Parish,* par. 18–25; *Swartzbauer,* par. 53–64, 85–94, 107–121; *Hurt,* par. 56–72, 108, 238–272; *City of Phila.,* par. 2, 35–76, 11–117, 135, 138–148.

**10.** In fact, Judge Sarokin also found that

> CU has not made any contention that it actually has reason to believe NL committed inten-

tional damage. Thus, CU has not demonstrated that there is a "substantial issue" as to coverage. The fact that the underlying complaints allege both intentional tort and negligence does not as a matter of law call the insurer's duty to defend into question.

*NL Indus.,* No. 91–2124 at 20, 1991 WL 398678.

**11.** CU states that "the LIA documents obtained by Commercial Union clearly establish that, through NL's intimate involvement with the LIA, NL knew long before Commercial Union's policies became effective, and therefore expected, that lead paint poisoning of children and painters was occurring and would continue to occur." (CU's Brief in Opp. at 19).

product were sufficient to infer intent by a manufacturer to injure consumers, then no manufacturer would ever be able to seek coverage from an insurer because every product has certain known dangers and risks.

*Id.* at 585.

CU contends that the *Sherwin–Williams* decision "has no application" and instead this Court "is bound to follow the dictates ... in the Burd decision ...." (Tr. at 32). While it is true that a ruling from Ohio is not binding upon a New Jersey court, the logic of *Sherwin–Williams* is compelling.

CU has not proffered any other evidence, besides NL's membership in the LIA, to show that NL intentionally manufactured a known "pollutant" during the policy period. In *Morton,* the court found that:

The conclusion is inescapable that from as early as 1956, when the unacceptable quality of its emissions first was brought to Berk's attention, the discharges of pollutants thereafter occurred intentionally. The intentional nature of the discharges is confirmed by Berk's and Wood Ridge's continued evasion of and postponements of compliance with the repeated demands by Department of Health engineers that the discharges into Berry's Creek cease or that the company install adequate treatment facilities. Knowledge that its discharges were likely to cause harm was also inferable from the regular reports submitted and demands for compliance asserted by state engineers, which Berk and Wood Ridge consistently ignored.

*Morton Int'l,* 134 N.J. at 91–92, 629 A.2d 831. The facts of *Morton* are therefore distinguishable from those in the instant case, given the magnitude of objective factors pointing towards Berk's and Wood Ridge's knowledge of and conduct in intending to cause injury.

In addition, it should be noted that *Morton* is a dispute over which party must bear the cost of coverage for remediation. The case at bar involves the duty to defend; NL has

not yet been found liable on any of the underlying claims. CU therefore cannot avoid its duty to provide a defense for NL.

### 4. Notice Provision

■ CU also claims that NL immediately retained counsel upon learning of the four new claims, rather than forwarding the complaints to CU, thus breaching the notice provisions of the policies.[12] (CU's Brief in Opp. at 1). Specifically, CU claims that:

1. NL was billed by Kirkland & Ellis (K & E) on August 5, 1991 for the defense of the *Orleans Parish* suit, although CU was not notified of the claim until September of 1991;

2. NL was billed on June 25, 1991 in *Swartzbauer,* but CU was not notified until July 17, 1991;

3. NL was billed on June 26, 1991 in *Hurt,* but CU was not notified until August 26, 1991; and

4. NL was billed on November 9, 1990 in *City of Phila.,* but CU was not notified until November 22, 1990.

*Id.* at 2–3.

Under New Jersey law, an insured has an obligation to notify its insurer of a claim "as soon as practicable," or "within a reasonable time." *Miller v. Zurich Gen. Acc. & Liab. Ins. Co.,* 36 N.J.Super. 288, 294, 115 A.2d 597 (App.Div.1955). A "reasonable time" is interpreted according to the insured's viewpoint, as "... the terms of an insurance policy are not talked out or bargained for as in the case of contracts generally ... hence an insurance contract should be read to accord with the reasonable expectations of the purchasers so far as its policy language will permit." *Cooper v. Gov't Employees Ins. Co.,* 51 N.J. 86, 93, 237 A.2d 870 (1968).

CU claims that NL failed to meet its notice obligation because "[i]f it was practicable for NL to retain defense counsel, it was also clearly practicable for NL to notify the insurer which it contends must pay those defense expenses," even though "in most instances,

---

12. The notice provisions of the policies state that:
[I]f claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representatives.
(CU's Brief in Opp. at 13).

only a few weeks elapsed between NL's receipt of a complaint and NL's notifying Commercial Union of that complaint." (Defendant's Brief in Opp. at 13–14). CU, however, ignores a pertinent fact. CU has long been aware that NL had retained K & E to defend in the lead paint claims. (Tr. at 20–21).[13] In fact, it was CU that forced NL to obtain counsel on the three original claims, by refusing to provide coverage under NL's policies.

The burden of proving failure to give notice rests with the insurance carrier. *Mariani v. Bender,* 85 N.J.Super. 490, 499, 205 A.2d 323 (App.Div.1964). Also, New Jersey law requires a showing of prejudice on a claim of untimely notice. *See Cooper v. Gov't Employees Ins. Co.,* 51 N.J. 86, 94, 237 A.2d 870 (1968) (carrier must prove both breach of notice provision and likelihood of appreciable prejudice). Since it was CU that forced NL to obtain separate counsel on all of its claims, and as CU has long been aware that K & E is representing CU on the defense of its claims, CU cannot claim that it suffered any prejudice by the slight delay in being notified of the four new lead paint claims.[14]

### 5. Right to Control the Defense

█ CU states that NL deprived CU of its right to select defense counsel for NL, and its right to control the defense of the four new claims. An insurer loses its right to control the insured's defense, however, if a conflict of interest is present. Stated the court in *Burd:*

> There may be cases in which the interests of the carrier and the insured coincide so that the carrier can defend such an action with complete devotion to the insured's interest. But.... if the case may be so defended by a carrier as to prejudice the insured thereafter upon the issue of cover-

age, the carrier should not be permitted to control the defense.

*Burd,* 56 N.J. at 389, 267 A.2d 7. In circumstances where a conflict of interest occurs, the insurer's duty to defend is instead transformed into a potential duty to reimburse. *NL Indus.,* No. 91–2124 at 18, 1991 WL 398678, citing *Burd,* 56 N.J. at 390, 267 A.2d 7. *See also Cooper Lab.,* 802 F.2d at 675; *CPS Chem. Co., Inc. v. The Continental Ins. Co.,* 203 N.J.Super. 15, 19, 495 A.2d 886 (App.Div.1985).

A conflict of interest is certainly present here. CU strongly argues the point that NL expected or intended to cause the lead poisoning that NL claims is covered by the policies. In fact, at the time NL received the complaint on the four new claims, NL and CU were already in litigation over the duty to defend, and CU had been ruled against on the issue of its right to control NL's defense.[15] (Tr. at 19–20). CU even admits that a conflict is present, which "arose because the complaints alleged non-covered intentional torts in addition to potentially covered claims and because this Court viewed New Jersey law as requiring an insurer to defend all claims where a complaint states both covered and non-covered claims." (CU's Memo. in Reply at 24). CU's claim that NL deprived it of its right to control NL's defense is without merit.

### 6. Cooperation Clause

CU's policies impose a duty on the insured "to cooperate with the Company." (CU Brief in Opp. at 17). CU claims that NL has violated this duty by:

> [A]damantly insisting on the retention of K & E, retaining K & E prior to providing Commercial Union with notice, and failing to provide Commercial Union with infor-

---

13. Tr. = Transcript of May 13, 1993 oral argument.

14. When asked at oral argument what prejudice CU has suffered, counsel responded "the prejudice is occasioned by our inability to have selected independent counsel ..." (Tr. at 21). The following section of the opinion demonstrates that CU is not entitled to this privilege under the law. In addition, NL also points out that after it was notified, CU did not bother responding to NL's notification letters. (NL Reply Memo. at 3).

15. Stated Judge Sarokin:

> [B]ecause the underlying complaints do allege intentional tort in addition to negligence, and given *Burd*'s concern that there may be a conflict of interest where the insurer controls the defense, the court concludes that in this case, CU's duty to defend is translated into a duty to reimburse NL for its defense costs.

*NL Indus.,* No. 91–2124, at 21, 1991 WL 398678.

mation and documentation for these four new claims. NL has only submitted bills to Commercial Union for K & E's services and has not provided Commercial Union with the opportunity to have *any* input concerning NL's defense.

*Id.* In response, NL argues that:

NL has provided CU with all documents that this Court deemed relevant to the determination of CU's duty to defend. (*See* 11/9/92 Tr. at 58–64). Furthermore, CU was provided with information concerning NL's defense during the prior damage trial. Consequently, CU's claim that NL has failed to cooperate is based solely on its unilateral—and wrong—interpretation of what is relevant regarding the determination of CU's duty to defend.

(NL Reply Memo. at 6–7).

The burden of proving breach of the covenant to cooperate rests with the insurer. *See Cooper v. Gov't Employees,* 51 N.J. at 94, fn. 3, 237 A.2d 870, citing *Mariani v. Bender,* 85 N.J.Super. 490, 500, 205 A.2d 323 (App.Div. 1964), *cert. denied,* 44 N.J. 409, 209 A.2d 143 (1965). "In order to relieve itself of liability under the policy the insurance carrier must show that the cooperation clause was deliberately breached in a material or essential particular." *Mariani,* 85 N.J.Super. at 499, 205 A.2d 323.

▩ CU's arguments that NL's retention of K & E and NL's delay in giving notice to CU of the four new claims were somehow a breach of the policies in issue has been demonstrated to be meritless. CU is thus left only with the allegation that NL has not supplied it with the information and documentation which was required under the cooperation clause of the policies.

On August 29, 1992, NL responded to CU's discovery requests by providing CU with "the underlying complaints, all documents regarding or relating to notices, demands or requests between NL and its insurers related to defense or immunity for the four lead paint claims and itemized bills reflecting NL's defense expenditures for these claims." (K & E Letter to this Court dated October 13, 1992 at 3). CU has received the discovery to which it is entitled, in the same manner as has NL.

### 7. The *Orleans Parish* Claim

CU has set forth the argument that the *Orleans Parish* claim differs from the other three new claims because "it fails to allege that the plaintiffs have suffered any injury." (CU's Brief in Opp. at 21). Defendant bases this allegation upon the statement in the claim that "[i]t has recently come to petitioner's attention that the presence of lead based paint in the various school buildings owned by petitioner represents *a potential hazard* to the children who are students at the school." *Id.* CU cites as support for its proposition *State v. Signo Trading Int'l, Inc.,* 130 N.J. 51, 612 A.2d 932 (1992), which holds, in part, that the cost of future damage is not covered absent the existence of a past or present injury. *Id.* at 64, 612 A.2d 932.

CU has misconstrued what is at issue here. At issue is CU's duty to defend NL on the underlying claims, not whether CU will be ultimately responsible for providing coverage on the claims. The latter issue will be decided pursuant to Louisiana law. Judge Sarokin has already ruled on the issue at hand when he held that abatement costs are covered under CU's policies; "There is no question that under New Jersey law, and insured's damages include abatement costs in order to avoid future bodily injury and property damage to third parties." *NL Indus.,* No. 91–2124 at 30, 1991 WL 398678.

Furthermore, Judge Sarokin also held that abatement costs are covered under the policies regardless of whether the injury sought to be avoided is property damage or bodily injury. *Id.* The *Orleans Parish* claim alleges *existing property damage to the school buildings and to the surrounding soil.* (NL Exhibit B at 27). CU, therefore, is obligated to provide a defense for this claim, under its policies.

### 8. Attorney's Fees

▩ A trial judge is vested with broad discretionary powers in deciding whether to award attorney's fees in an action on a liability or indemnity insurance policy. *Molyneaux v. Molyneaux,* 230 N.J.Super. 169, 181, 553 A.2d 49 (App.Div.1989).

*N.J.Ct.R.* 4:42–9(a)(6) provides that an award of counsel fees is allowable *"[i]n an action upon a liability or indemnity policy of insurance,* in favor of a successful claimant." The award is authorized under the rule "even if the insurer's refusal to honor a policy demand was in good faith and despite the novelty of the legal question upon which its basic liability depended." *N.J.Ct.R.* 4:42–9(a)(6), Comment at 1004. The purpose of the rule is to "provide to an insured the benefits of the insurance contract without the necessity of obtaining a judicial determination that the insured is in fact entitled to such protection." *Molyneaux,* 230 N.J.Super. at 181, 553 A.2d 49.

This notion was likewise adopted by the Fifth Circuit:

> [A contrary rule] appears to be unfair to the insured. After all, the insured had contracted to defend the insured, and it failed to do so. It guessed wrong as to its duty, and should be compelled to bear the consequences thereof. If the [contrary rule were followed], it would actually amount to permitting the insurer to do by indirection that which it could not do directly. That is, the insured has contract right to have actions against him defended by the insurer, at its expense. If the insurer can force him into a declaratory judgment proceeding and, even though it loses in such action, compel him to bear the expense of such litigation, the insured is actually no better off financially than if he had never had the contract right mentioned above.

*Green v. J.C. Penney Auto Ins. Co., Inc.,* 806 F.2d 759, 766 (7th Cir.1986), quoting J. Appleman, 7C INSURANCE LAW & PRACTICE § 46911 at 283 (1979).

The instant matter presents an example of exactly the type of behavior that *R.* 4:42–9(a)(6) is designed to deter. CU had its day in court on the issue of its duty to defend; any further debate on this issue in this court is protracted litigation, notwithstanding CU's apparent good faith belief that there is merit to its refusal to defend the four new claims. NL should not have to bear the further cost of having to enforce its contractual rights under the policies.

NL is to submit a certification of its costs relating to the preparation of its motion for summary judgment and for the preparation of its defense to CU's cross-motion for summary judgment. The amount of the fee award will be determined according to the analysis required by the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), where it was held that "the most useful way to determine the amount of a reasonable fee award to a prevailing party is to multiply the number of hours reasonably expended on a litigation by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. at 1939.

### CU's Cross–Motion for Summary Judgment

CU has filed a cross-motion for summary judgment, declaring that:

> NL breached both the "notice" and "duty to cooperate" provisions that are conditions precedent to NL receiving insurance coverage under the Commercial Union policies. For this reason, Commercial Union is entitled to summary judgment declaring that it has no duty to defend NL against all four claims and dismissing NL's Second Amended Complaint with prejudice.

(CU's Memo. in Support at 1). CU also goes on to state that NL's conduct was expected or intended, and that one of the complaints alleges only a future and not present or past injury, therefore CU's policies do not cover these claims. CU relies upon *SL Indus.* as authority for its position. CU's cross-motion for summary judgment is nothing more than a reiteration of its opposition to NL's motion for summary judgment, which has already been determined to be without merit.

### CONCLUSION

For the aforementioned reasons, NL's motion for summary judgment is granted in its entirety, and CU's cross-motion for summary judgment is denied with prejudice. CU is to be assessed attorneys fees for the preparation and defense of NL's motion for summary judgment and any opposition by NL in response to CU's cross-motion for summary judgment.